UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

TERRANCE D. FOX,

                              Plaintiff,

        -v.                                                  1:06-CV-1135 (LEK/ RFT)

NATIONAL RAILROAD PASSENGER
CORPORATION (AMTRAK),

                              Defendant.

_____

**MEMORANDUM-DECISION AND ORDER**

        This action arises out of Plaintiff Terrance D. Fox's ("Plaintiff" or "Fox") employment with

the National Railroad Passenger Corporation ("Defendant" or "Amtrak") at its maintenance facility

in Rensselaer, New York.  See Compl. (Dkt. No. 1).  Before the Court is a Motion for summary

judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, filed by the Defendant.  Mot.

(Dkt. No. 23).   Fox alleges that the Defendant created a hostile work environment and took various

actions in retaliation for Fox's previous filing of an Equal Employment Opportunity Commission

("EEOC") charge and civil action against the Defendant, in violation of Title VII of the Civil Rights

Act of 1964, as amended, codified at 42 U.S.C. § 2000e et seq. ("Title VII").  See Compl. ¶¶ 19-26.

For the reasons discussed below, the Defendant's Motion is granted and this case is dismissed.

**I.      BACKGROUND**

        Fox was employed as an electrician at Amtrak's Albany/Rensselaer mechanical facility from

approximately 1982 until April 2006.  Compl. ¶ 8;  Affidavit of Laurence M. Lohman, Mechanical

Superintendent at the Albany/Rensselaer Facility ("Lohman Aff.") ¶ 5 (Dkt. No. 23, Attach. 1).

Electricians at Amtrak are covered by a collective bargaining agreement ("CBA") between Amtrak

and the International Brotherhood of Electrical Workers ("IBEW").  Lohman Aff. ¶ 6.  Amtrak

contends that all employees at the Albany/Rensselaer facility are also subject to the code of conduct

embodied in Amtrak's Standards of Excellence ("Standards").  Lohman Aff. ¶ 9; Standards (Dkt.

No. 23, Attach 3).  Violations of the Standards can result in disciplinary action, including

termination.  Lohman Aff. ¶ 10.  Fox contends that Amtrak enacted a more diversified work policy

in 2000, which superseded the Standards.  Affidavit of Terrance D. Fox ("Fox Aff.") ¶ 8 (Dkt. No.

25, Attach. 2); Amtrak Business Diversity Policy ("Diversity Policy") (Dkt. No. 25, Attach. 4, Ex.

B).

 The Standards prohibit an employee from "padding" the payroll by accepting pay for time

not actually worked or otherwise earned, such as when an employee leaves work before his shift

ends and asks a co-worker to punch his timecard at the end of his shift.  Lohman Aff. ¶¶ 11-12.  On

March 12, 1997, Fox filled out a form acknowledging his receipt of a copy of the Standards.  Dkt.

No. 23, Attach. 4.

 By letter dated May 27, 2005, Amtrak charged Fox with padding the payroll on six

occasions throughout the month of May.  Dkt. No. 23, Attach. 5.  Fox alleges that these charges

were false, and that Amtrak applied a different standard than traditionally applied to other workers.

See Compl. ¶ 15.  On June 10, 2005, Amtrak sent Fox a letter offering to discuss a settlement before

the investigation of the charges was to begin.  Dkt. No. 23, Attach. 7.  On June 28, 2005, Amtrak

sent Fox a letter notifying him that the hearing regarding the charges was adjourned by mutual

agreement.  Dkt. No. 23, Attach. 11.

On July 5, 2005, Fox took a medical leave of absence from Amtrak.  Fox Dep. at 28 (Dkt. No. 23, Attach. 38-39; Dkt. No. 25, Attach. 5).  Fox alleges that his medical leave was necessitated by the stress caused by the Defendant's discriminatory conduct towards him.  See Compl. ¶ 17.  On April 4, 2006, Amtrak notified Fox that he was considered as having resigned his employment, due to his alleged failure to comply with the company's leave of absence policy and failure to contact Amtrak to schedule a return to work physical.  See Dkt. No. 23, Attach. 13-20.

On July 25, 2005, Fox filed a charge of discrimination with the EEOC, alleging that the Defendant discriminated against him based upon his race and in retaliation for Fox's filing of a previous EEOC charge against Amtrak in December 2003 and a federal lawsuit against Amtrak in September 2004.  Dkt. No. 23, Attach. 31.  On June 27, 2006, the EEOC sent Fox a Right-to-Sue letter, stating that the agency was unable to conclude that Amtrak had violated the applicable statutes.  Dkt. No. 23, Attach. 32.

Plaintiff filed the instant Complaint on September 21, 2006.  He commenced this action *pro se*, but was represented by counsel during his deposition.  Fox Dep. at 4.

## II.     STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Beard v. Banks, 548 U.S. 521, 529 (2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  A court must "'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (quoting Cifra v. General

Electric Co., 252 F.3d 205, 216 (2d Cir. 2001)).  However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

If the moving party meets its initial burden of demonstrating that no genuine issue of material fact exists for trial, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citations omitted).  The nonmovant "must come forth with evidence sufficient to allow a reasonable jury to find in her favor."  Brown, 257 F.3d at 251 (citation omitted).  The nonmoving party "may not rely merely on allegations or denials in its own pleadings;" bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment.  Fed. R. Civ. P. 56(e)(2); see Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991); Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990).  "Factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony."  Brown, 257 F.3d at 251 (citation omitted).

## III.    DISCUSSION

### A.    Hostile Work Environment Claims

Title VII prohibits race-based employment discrimination that results from the creation of a hostile work environment.  To succeed on a hostile work environment claim, the plaintiff must demonstrate (1) that the workplace was permeated with "harassment [that] was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

environment,'" and (2) that "a specific basis exists for imputing the objectionable conduct to the employer."  Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)).  The first part of this test has both an objective and a subjective element.  The demonstrated transgressions "must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive the environment to be abusive."  Alfano, 294 F.3d at 374 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)) (abrogated on other grounds by Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 753 (1998)).  The plaintiff must also show that the objectionable conduct occurred because of the plaintiff's race.  See Alfano, 294 F.3d at 374.

In evaluating whether a workplace environment is sufficiently abusive so as to support a hostile work environment claim, courts look to the totality of the circumstances.  Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000).  Factors that a court may examine in deciding whether the workplace environment was so pervasively discriminatory as to be actionable include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Alfano, 294 F.3d at 374 (quoting Harris, 510 U.S. at 23).  "Isolated incidents typically do not rise to the level of a hostile work environment unless they are 'of sufficient severity' to 'alter the terms and conditions of employment as to create such an environment.'"  Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006) (quoting Patterson v. County of Oneida, 375 F.3d 206, 227 (2d Cir. 2004)); see also Alfano, 294 F.3d at 373-74 ("The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his] employment were thereby altered.")

(internal citations omitted).

Plaintiff cites various incidents in support of his claim that Defendant created a hostile work environment.  Plaintiff claims that Jim Shelgren, Plaintiff's supervisor/foreman, observed Plaintiff's co-workers "verbally degrading" Plaintiff and took no corrective action to address the racial discrimination.  Compl. ¶ 21.  More specifically, Plaintiff explained in his deposition that a co-worker said in the presence of Shelgren, "Is that a black man over there?  Oh, we better hurry up and get out of here because we're in a bad neighborhood and we might get in trouble."  Fox Dep. at 255. Allegedly, Shelgren laughed at this comment before the group dispersed.  Id. at 256, 257.  Fox also claims that Shelgren called him a "militant black troublemaker" in the presence of co-workers.  Fox Aff. ¶ 8.  Plaintiff further claims that Shelgren told Plaintiff's co-workers and supervisors that other co-workers were supporting Plaintiff's efforts in a prior civil action against Defendant.  Compl. ¶ 20.  Finally, Plaintiff claims that Shelgren told several of Plaintiff's co-workers that they should "watch their backs" due to their support of Plaintiff, and that Shelgren initiated work standard charges against them using a different standard than traditionally applied against other workers. Compl. ¶ 22.

The Defendant argues that the Court may not consider the "militant black troublemaker" comment, because the comment does not appear in Fox's EEOC charge.  While courts generally may not consider Title VII claims not alleged in an employee's EEOC charge, "claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are 'reasonably related' to those that were filed with the agency."  Shah v. New York State Dept. of Civil Services, 168 F.3d 610, 614 (2d Cir. 1999).  Circumstances where allegations are reasonably related to those in a plaintiff's EEOC charge include (1) "allegations where the complained-of

conduct can reasonably be expected to grow out of the charge of discrimination and therefore fall within the scope of the EEOC investigation[;]" (2) claims alleging retaliation for the filing of the EEOC charge; and (3) "further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." Daigle v. West, 225 F. Supp. 2d 236, 242 (N.D.N.Y. 2002) (internal quotations and citations omitted). The Second Circuit has noted that the "reasonably related" exception to Title VII's exhaustion requirement "is essentially an allowance of loose pleading and is based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel." Williams v. New York City Housing Authority, 458 F.3d 67, 70 (2d Cir. 2006) (internal quotations and citations omitted).

Fox's EEOC charge references the "bad neighborhood" comment but not the "militant black troublemaker" comment Fox refers to in his affidavit opposing summary judgment. See Dkt. No. 23, Attach. 31; Fox Aff. ¶ 8. However, the Court considers this latter statement to be reasonably related to Fox's EEOC charge, even though that charge did not specify the particular statement and the statement was made before the filing of the EEOC charge. See Branch v. Guilderland Cent. School Dist., 239 F. Supp. 2d 242, 258 (N.D.N.Y. 2003) (conduct need not be successive to EEOC charge to fit within the "reasonably related" exception). In his EEOC charge, Fox stated that "Shelgren has made comments that I will 'cause problems for everyone' and that I 'could not be trusted because of the lawsuit.'" Dkt. No. 23, Attach. 31. Fox also claimed that he had been targeted because of his race. Id. Thus, while Fox's EEOC charge does not contain the specific phrase "militant black troublemaker," his allegations were sufficient to apprise the EEOC of the need to investigate whether Shelgren, for racial reasons, had targeted Fox as someone who would cause problems. As the substance of the EEOC charge was reasonably related to the allegations Fox

now makes opposing summary judgment, the Court will consider Fox to have sufficiently exhausted his claims.

Nevertheless, the Court concludes as a matter of law that the alleged conduct was not severe or pervasive enough to create an objectively hostile work environment. As for the two alleged racially degrading comments,[1] while the Court does not deny the comments were properly construed as offensive, the Second Circuit has noted that

> [The] mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII. For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity . . . instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments. Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment[.]

Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotations and citations omitted). The alleged comments, while regrettable, lack the frequency and severity necessary to sustain a hostile work environment claim. See Augustin v. The Yale Club of New York City, 274 Fed. Appx. 76, 77 (2d Cir. 2008) (allegations of sporadic incidents of name-calling over a multi-year period not sufficient to sustain a hostile work environment claim); Eldaghar v. City of New York Dept. of Citywide Admin. Servs., 2008 WL 2971467, *14-17 (S.D.N.Y. 2008) (six alleged derogatory comments, even when coupled with other alleged discriminatory conduct, were

---

[1] Amtrak also argues that summary judgment is appropriate as to the hostile work environment claims based on the comment regarding a "bad neighborhood," because Fox did not subjectively perceive the statements to be abusive. At Fox's deposition, he stated that these statements was merely "jokes" and that it was not significant that he had been referred to as a "black man." Fox Dep. at 258. Yet his other testimony seems to indicate that the comments seriously affected him, especially because of his having previously filed a complaint against the company. Id. The Court need not resolve this issue, as Fox has not established the objective hostility of the workplace environment necessary to support his claim.

insufficient to overcome defendant's motion for summary judgment); Adam v. Glen Cove School, 2008 WL 508689, *11 (E.D.N.Y. Feb. 21, 2008) (citing cases where infrequent offensive comments were found insufficient to sustain hostile work environment claim).

Nor do the allegations regarding Shelgren's statements to other co-workers regarding their support of Fox in his dispute with the company, when considered in combination with the alleged racially derogatory comments, suffice to overcome the Defendant's Motion for summary judgment. At his deposition, Fox conceded that the alleged comments by Shelgren to other Amtrak employees regarding their support of Fox and their need to "watch their backs" were made after Fox went on medical leave.[2]  See Fox. Dep. at 315-16, 322-23.  Thus, the only alleged incidents supporting Fox's claim of a hostile working environment to which Fox himself was a witness were the racially insensitive statements described above.

Amtrak cites Leibovitz v. New York City Transit Authority, 252 F.3d 179 (2d Cir. 2001) for the proposition that a plaintiff cannot establish a hostile work environment claim through the experiences of his co-workers.  The Court does not read Leibovitz quite as broadly as does the Defendant.  In Leibovitz, the Court held that "Title VII's prohibition against hostile work environment discrimination affords no claim to a person who experiences it by hearsay."  252 F.3d at 182.  In the Leibovitz plaintiff's trial, the jury rejected her claims that she had personally experienced harassment, but awarded her damages based on the emotional trauma she suffered due to hearing about the harassment of other women in the workplace and the inadequate response by

--------

[2] In Plaintiff's Memorandum of Law in Opposition to the Defendant's Motion, Plaintiff asserts that he witnessed the harassment and derogatory statements made to his co-workers. However, Plaintiff cannot rely upon these allegations to oppose Defendant's Motion to the extent that these allegations contradict his prior deposition testimony.  See Brown, 257 F.3d at 251.

her employer to that harassment.  Id.  On appeal, the Second Circuit reversed the trial court's denial of the defendant's motion for judgment as a matter of law, concluding that the alleged harassment of women in other departments, which the plaintiff did not witness, could not have affected the terms and conditions of the plaintiff's working environment.  Id. at 189-190.

However, the Leibovitz court noted that remarks made outside of a plaintiff's presence or remarks directed towards others could still be relevant to a hostile work environment claim.  242 F.3d at 190.  Thus, while Leibovitz would not prevent a Title VII plaintiff from relying on evidence of remarks made outside of the plaintiff's presence to support a claim, a Title VII plaintiff could only use such evidence to show how the comments contributed to his own working environment being hostile.  Here, Fox was no longer an active employee when the incidents allegedly occurred, and Fox did not witness any of the statements to co-workers regarding their need to "watch their backs."  Therefore, the Court fails to see how these incidents affected his working environment. See Eldaghar, 2008 WL 2971467, *16 (transfer denial not evidence of a hostile work environment because it did not occur until after plaintiff's termination); Corrigan v. Labrum & Doak, 1997 WL 76524, *12 (S.D.N.Y. Feb. 21, 1997) ("As to the claims of . . . hostile work environment sexual harassment, the date of the last discriminatory act can only be deemed to be on or before February 23, 1993 . . . [as] Plaintiff did not return to work after that date . . . .").

Because Plaintiff has failed to establish conduct sufficiently objectionable during his active service as to render the workplace objectively hostile and abusive, the Defendant's Motion for summary judgment is granted as to the hostile work environment claims.[3]

---

[3] Plaintiff's Second and Fourth Causes of Action, in addition to raising hostile work environment claims, can arguably be construed as allegations that the Defendant retaliated against the Plaintiff's co-workers for their support of the Plaintiff.  However, the Plaintiff lacks standing to

**B.      Retaliation Claims**

Title VII retaliation claims are analyzed under the burden-shifting framework as set forth in

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Terry v. Ashcroft, 336 F.3d 128, 141

(2d Cir. 2003).  To establish a prima facie case of retaliation, a plaintiff must show that (1) he

engaged in a protected activity; (2) the employer was aware of this activity; (3) the employer took

adverse action against the plaintiff; and (4) a causal connection exists between the protected activity

and the adverse action.  Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 608 (2d Cir. 2006).

Causation can be shown either (1) directly, "through evidence of retaliatory animus directed against

the plaintiff by the defendant," or (2) indirectly, by demonstrating "that the protected activity was

followed closely by discriminatory treatment, or through other circumstantial evidence such as

disparate treatment of fellow employees who engaged in similar conduct."  Gordon v New York

City Bd., 232 F.3d 111, 117 (2d Cir. 2000).

If the plaintiff can establish a prima facie case of retaliation, the burden shifts to the

defendant to articulate a legitimate, non-retaliatory reason for its employment decision.  Quinn v.

Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998) (citations omitted).  If the defendant

meets its burden, the plaintiff must then "adduce evidence 'sufficient to raise a fact issue as to

whether [the employer]'s reason was merely a pretext' for discrimination."  Quinn, 159 F.3d at 769

(quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1309 (2d Cir. 1995)).

Plaintiff claims that, in retaliation for the Plaintiff filing an EEOC charge and a previous

lawsuit against the Defendant, the Defendant retaliated by intentionally and falsely accusing

bring a retaliation claim against the Defendant for any of the Defendant's actions against third
parties.  See Kern v. City of Rochester, 93 F.3d 38, 44 (2d Cir. 1996) (citing Warth v. Seldin, 422
U.S. 490, 499 (1975)).

Plaintiff of padding the payroll, using a different disciplinary standard than traditionally applied against other workers, and by improperly discharging Plaintiff when he was out on medical leave.[4] These claims will be analyzed in turn.

       **1.      Charges of Padding the Payroll**

Plaintiff has clearly met the first two prongs necessary to establish a prima facie case of retaliation–he engaged in a protected activity (the filing of both an EEOC charge and later a federal action against Amtrak) and his employer was clearly aware of that activity.  Amtrak argues that Fox has failed to meet the third prong of the test– that Amtrak's charge that Fox padded the payroll constitutes an adverse employment action.  To meet this prong of the test, Fox must show that "a reasonable employee would have found the challenged action materially adverse."  <u>Burlington Northern and Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006).  As the Supreme Court noted in <u>Burlington Northern</u>, the anti-retaliation provision of Title VII seeks to prohibit only those employer actions that are likely to deter victims of discrimination from filing complaints with the EEOC or the courts.  <u>Id.</u> (internal quotation and citations omitted).  Examples of materially adverse employment actions for purposes of Title VII retaliation claims include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  <u>Joseph v. Leavitt</u>, 465 F.3d 87, 90 (2d Cir. 2006) (internal quotations and citation omitted).

_____

[4] The Court need not address the retaliation claim alleged in the Seventh Cause of Action of Plaintiff's Complaint, as during his deposition, Plaintiff agreed to withdraw this claim, on the ground that the issue had been litigated and decided in Plaintiff's prior lawsuit against the Defendant.  Fox Dep. at 310-11.

The Defendant relies on Joseph v. Leavitt in support of its position that the padding charge did not constitute an adverse employment action.  In that case, the Second Circuit noted that "an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner."  Joseph v. Leavitt, 465 F.3d at 91.  However, Fox alleges that the Defendant's padding charges against him were intentionally false and a result of a different standard being applied to him than against other workers.  The padding charges did not lead to any loss of wages or other disciplinary action against Fox, as the hearing between Amtrak and Fox's union regarding the charges was adjourned when Fox went on medical leave.  Lohman Aff. ¶ 26.

The Court need not decide whether the padding charges, without more, constitute an adverse employment action, as Fox has failed to meet the fourth prong of his prima facie burden– demonstrating a casual connection between the charges and his filing of the EEOC charge and complaint against the company.  Fox's only purported direct evidence establishing a causal connection is the allegation that a co-worker, a union representative, told Fox that an Amtrak supervisor told the co-worker that the padding charges against Fox were brought as a result of Fox filing a lawsuit against the company.  See Fox Aff. ¶ 5.  However, the Federal Rules specify that an affidavit opposing summary judgment "must be made on personal knowledge, set[ting] out facts that would be admissible in evidence[.]"  Fed. R. Civ. P. 56(e)(1).  Fox has not provided an affidavit from the co-worker attesting to this alleged statement by the supervisor.  Thus, Fox cannot rely on this alleged statement to oppose summary judgment.  See Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999) (hearsay statement as to what plaintiff was told by third party could not be considered in opposition to motion for summary judgment).

13

Moreover, Fox has failed to provide sufficient indirect proof of causation to establish a prima facie case of retaliation.  Beyond his conclusory allegations, Fox has provided scant circumstantial evidence to show causation.  In addition, the temporal proximity between the protected activity and the alleged retaliatory action is insufficient to establish indirect proof of causation.  Fox filed a charge of discrimination against Amtrak with the EEOC in December 2003, and a complaint in federal court against Amtrak in September 2004.  Amtrak charged Fox with padding the payroll in May 2005.  Thus, there was an approximately 8-month time lag between the most recent protected action (the filing of the complaint) and the alleged retaliatory act.  Such a time lag is too long to suggest a causal connection, without more evidence of retaliatory animus.  See Hollander v. American Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990) (three months too long, by itself, to suggest retaliatory animus); see also Clark County School Dist. v Breeden, 532 U.S. 268, 273 (2001) (internal citations omitted) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'").

Even if Fox can establish a prima facie case of retaliation, he has not presented sufficient evidence to overcome the legitimate reasons offered by Defendant for their charges that he padded the payroll.  Amtrak argues that from May 2000 to March 2005, padding violations at the Albany/ Rensselaer facility were rare, but reports of padding were increasing by March 2005.  Lohman Aff. ¶¶ 14-15.  Amtrak further argues that "[i]n an effort to address the growing problem of time card fraud at the Albany/Rensselaer facility," an Amtrak supervisor directed two general foremen "to monitor the exits of the building about an hour before each shift ends," and that all employees were

warned that padding the payroll in any fashion was prohibited.  Lohman Aff. ¶¶ 15-18.  Fox was

charged with padding the payroll after supervisors allegedly witnessed him leaving before his shift

was scheduled to end and earlier than his time card indicated.  Dkt. No. 23, Attach. 5.

Amtrak has clearly articulated a legitimate, non-retaliatory rationale for its decision to charge

Fox with padding the payroll– its efforts to reduce the incidence of employees receiving full pay

despite leaving work before their shifts were scheduled to end, and supervisors allegedly witnessing

Fox violate the no-padding policy.  Amtrak has also offered further indirect evidence to support its

position that the charges against Fox were a result of his actions, and not motivated by his race.  The

day after Fox was charged with padding the payroll, two other employees were charged–one white

male and one black male.  Id.  ¶ 20.  Another white male was set to be charged as well, but he chose

to resign in exchange for the Defendant's promise not to issue written charges.  Id.  Since June of

2005, Amtrak disciplined 19 employees for padding the payroll– sixteen white males, two white

females and one black male.  Lohman Aff. ¶ 27.

In response, Fox argues that prior to March 2005, Amtrak–pursuant to an implied

contract–simply docked the pay of employees caught padding the payroll, rather than bringing

workplace charges against those accused of such conduct.  However, Amtrak admits that in March

2005 the company changed its approach to padding violations, and Fox fails to show how the

company's rationale for this change was a pretext for retaliation.  Fox further argues that Amtrak's

Standards– the policy pursuant to which the padding charges were brought– were no longer in effect

in 2005, as he claims that the Standards was superseded in 2000 by Amtrak's Diversity Policy.  The

only evidence Fox offers in support of this contention is the affidavit of a co-worker who alleges

that at a workplace seminar in 2000, employees were told that the Diversity Policy was to replace

the Standards.  See Aff. of John Wynn ¶ 4 (Dkt. No. 25, Attach. 3).  Construing this evidence in the

light most favorable to Fox, no reasonable jury could conclude that Amtrak's proffered reason for

charging Fox with padding the payroll was a pretext for race-based retaliation.  The Diversity Policy

sets out standards for the company's positions regarding equal employment opportunity and

affirmative action.  The Diversity Policy does not establish workplace conduct standards or

otherwise address Amtrak's ability to initiate charges against employees for misconduct, except

insofar as the document prohibits race-based evaluation of employees.  See Diversity Policy at 2

("Managers and supervisors play a key role in ensuring that all personnel actions . . . are

administered without regard to race . . . [managers and supervisors should] evaluat[e] all applicants

and employees using the same performance-based or job-related criteria . . . .").

No reasonable jury could conclude that this document prohibited Amtrak from charging

employees for padding the payroll, or that this document creates a factual issue as to whether

Amtrak's proffered reasons for charging Fox were pretextual–especially in light of Amtrak's

uncontroverted evidence that the company brought padding charges not only against Fox, but

against several other employees, most of whom were Caucasian.  Fox's remaining arguments are

merely conclusory allegations that cannot suffice to overcome Amtrak's assertion of a legitimate,

non-retaliatory rationale for its decision to bring workplace charges against him.  See Ying Jing Gan

v. City of New York, 996 F.2d 522, 532-33 (2d Cir. 1993) (party opposing summary judgment "may

not rely simply on conclusory statements or . . . "'upon the mere allegations or denials of the

[nonmoving] party's pleading.'") (quoting Fed. R. Civ. P. 56(e)) (other citations omitted).

Therefore, Amtrak's Motion is granted as to this claim.

    **2.**        **Resignation/ Discharge from Employment**

Plaintiff also cannot make out a prima facie case of retaliatory motive for his discharge in April 2008.  While he meets the first three prongs necessary to establish a prima facie case of retaliation as to his discharge, he presents no direct evidence that he was discharged in retaliation for filing an EEOC charge and lawsuit against his employer.  Nor has he produced any indirect evidence of causation, such as circumstantial evidence or a short gap in time between his protected activity and his discharge.  Defendant sent Plaintiff notification of his discharge from employment in April 2006.  The nearly two-year time gap between the filing of Plaintiff's federal action and his discharge is much too long, by itself, to support an inference of retaliatory animus for his firing.

Moreover, even assuming that Plaintiff has met his prima facie burden, Amtrak would still be entitled to summary judgment.  Amtrak has offered ample evidence in support of its purported legitimate, non-retaliatory reason for Fox's discharge–his failure to comply with the Defendant's medical leave of absence policy and the CBA.  In rebuttal, Fox has not adduced sufficient evidence to raise a triable issue as to whether Amtrak's reasons were in fact a pretext for discrimination.

Amtrak employees seeking a medical leave of absence must provide the company with medical documentation within 10 days of the first date of the employee's absence, and must provide updated information every thirty days.  Dkt. No. 23, Attach. 12 at 2.  The policy states that "[i]f medical documentation is not received within 10 calendar days, you are expected to return to work immediately unless you have directly communicated the delay to an Amtrak Health Services staff member and received a concurrence for the delay."  Id.  Furthermore, Rule 28(b) of the CBA provides that

> Employees who absent themselves from work for five days without notifying the [Defendant] shall be considered as having resigned from the service and will be removed from the seniority roster unless they furnish the [Defendant] evidence of physical incapacity

> as demonstrated by a release signed by a medical doctor or that circumstances beyond their
> control prevented such notification.

Dkt. No. 23, Attach. 2.

Fox took a medical leave of absence from Amtrak on July 5, 2005.  Fox Dep. at 28.

Defendant sent Fox a letter by Certified Mail dated March 3, 2006 advising him that Amtrak's

Medical Director determined that his disability was not work related, and that Fox must

> now make arrangements for a return to work physical or provide additional medical
> documentation establishing that your alleged disability is work related.  You must contact
> this office to make arrangements to return to work or provide this medical documentation
> within ten (10) days of delivery of this letter.
>
> . . .
>
> Additionally, your physician must update [your medical] information every thirty days.
> Failure to furnish the required documentation within the time frame requested will result in a
> denial or interruption of your medical leave. . . .

Dkt. No. 23, Attach. 13.   The letter was returned to Amtrak on March 21, 2006, and marked

"Unclaimed."  Dkt. No. 23, Attach. 14.[5]

Defendant sent a follow-up letter to Fox dated March 23, 2006, stating that Amtrak had

received insufficient medical documentation for January through March 2006.  Dkt No. 23, Attach.

15.  The letter stated that Fox had 10 days from the receipt of the letter to provide the requested

information.  Id.  The letter further stated that

> Failure to comply with these instructions within 10 days to support your leave of absence
> will result in you being considered as Active and you must return to work immediately.  If
> you do not return to work, you will be considered as having resigned your employment with
> Amtrak. . . .

---

[5] At Fox's deposition, he denied that he ever refused to sign for a certified letter.  Fox Dep.
at 120.  As Amtrak is entitled to summary judgment despite Fox never receiving this letter, the
Court need not address why the letter was returned to Amtrak.

18

Id.  Defendant sent this letter via Federal Express, and the letter was delivered on March 24, 2006.

See Dkt. No. 23, Attach. 16.

> Defendant sent Fox another letter, dated March 28, 2006, advising Fox that
>
> the medical information submitted by you to date does not justify your continued absence from work . . . Consequently, you are now considered absent without permission.  If you do not contact this office within five (5) days of delivery of this letter to make arrangements for a return to work physical, you will be considered as having resigned from service in accordance with the terms of Rule 28 of the Amtrak/ IBEW agreement.

Dkt. No. 23, Attach. 17.  The letter included information on who Fox should contact to set up his

return to work physical.  Id.  This letter was also sent via Federal Express, and delivered on March

29, 2006.  See Dkt. No. 23, Attach. 18.

> Finally, Defendant sent Fox a letter dated April 4, 2006, advising Fox that he had "been

absent from work for more than five days without notifying" Amtrak and was "[t]herefore, under the

provision of Rule 28B [of the CBA] . . . considered as having resigned from Amtrak . . . ."  Dkt. No.

23, Attach. 19.

> Fox sent a letter to Amtrak dated April 20, 2006.  Dkt. No. 23, Attach. 21.  In this letter, Fox

acknowledged receiving Amtrak's March 23, March 28, and April 4 letters.  Id.  Fox also wrote that

Amtrak's determination that Fox had resigned was "totally false" and that he had sent the requested

forms to his physician.  Id.  However, the letter does not indicate that the physician sent those forms

to Amtrak.  At his deposition, Fox acknowledged that he did not contact Amtrak between March 28

and April 4, 2006.  Fox Dep. at 123.  Fox also stated at the deposition that his decision to not

contact the company was based on one of the aforementioned letters from Amtrak, which "told me

not to contact my supervisor" at Amtrak.  Id.  Following this statement, the Defendant's attorney

gave Fox another opportunity to review the letters, as well as other documents.  Id.  Following this

review, Fox acknowledged that he had "misinterpreted" the letters, and that none of the documents said not to contact his supervisors.  See id. at 124.

Thus, all of the documentary evidence in the record shows that Amtrak complied with both its medical leave policy and Rule 28(b) of the CBA when it determined that Fox had resigned his employment with the company.  Fox argues that Amtrak terminated him despite learning that the Amtrak medical department had given Fox an extension to provide the requested information. However, the only evidence he cites in support of this argument is an Amtrak Health Services medical progress report dated May 31, 2006, more than a month after Amtrak considered Fox to have resigned for failure to return to work.  Dkt. No. 25, Attach. 4, Ex. I.  The document, completed by a member of the Amtrak medical department, states that Fox

> did not understand why the documentation [he provided to Amtrak] was insufficient.  I explained to him that no objective explanation had been provided for extending his absence. . . . [Fox] said that the reason he is out is because of the conflict with his upper management. He said that he will not return to work as long as the same supervisors are there.  I state[d] that this should be handled administratively between him and the supervisors and that he should not use medical as a reason. . . .

Id.

This document does not provide support for Fox's argument that the Amtrak medical department had granted him an extension to provide medical information.  To the contrary, the document states that Fox "should not use medical as a reason" for his failure to return to work."  Id. Other than this document, Fox offers only conclusory assertions to support his claim that Amtrak's purported reason for his discharge is a pretext for discriminatory retaliation.  Thus, Amtrak is entitled to summary judgment on this claim.

**IV.   CONCLUSION**

Based on the foregoing discussion, it is hereby

**ORDERED**, that Defendant's Motion for summary judgment (Dkt. No. 23) is **GRANTED;** and it is further

**ORDERED**, that the case is **DISMISSED in its entirety with prejudice**; and it is further

**ORDERED**, that the Clerk serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

DATED:        February 19, 2009
              Albany, New York

Lawrence E. Kahn
U.S. District Judge

21